DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**PAMELA RAPP PARRIS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D21-2682

[April 12, 2023]

Appeal from the County Court for the Nineteenth Judicial Circuit, Indian River County; Michael Linn, Judge; L.T. Case No. 312020MM001119B.

Philip L. Reizenstein and Bhakti Kadiwar of Reizenstein & Associates, PA, Miami, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Lindsay A. Warner, Assistant Attorney General, West Palm Beach, for appellee.

PER CURIAM.

After the City of Sebastian's city manager announced a cancellation of a properly noticed city council meeting, three councilmembers, including the appellant, Pamela Parris, held a meeting anyway, during which they voted to terminate the employment of the city manager, the city attorney, and the city clerk, and voted to remove the mayor and replace him with Parris's co-defendant, Damien Gilliams. Based on this meeting, Parris and Gilliams were charged with violating section 286.011, Florida Statutes (2019), commonly referred to as the Sunshine Law. They were also charged with perjury based on statements which they made during an investigation of the Sunshine Law violations. Parris and Gilliams were tried together and found guilty of most counts. Parris appeals her convictions for one count of violating the Sunshine Law and two counts of perjury.[1]

---

[1] We take up Gilliams's appeal in a separate opinion in case 4D21-2667.

Parris raises multiple issues on appeal, most of which pertain to her conviction of a Sunshine Law violation. We address the following three arguments: (1) her conviction must be reversed where section 286.011 does not contain definitions for certain phrases; (2) her responses to the investigator's imprecise questions did not amount to perjury; and (3) her allegedly false statements were not material. We agree that the state failed to prove perjury as alleged in count V, and we reverse on this point, but we affirm with respect to the Sunshine Law arguments. Parris's remaining arguments lack merit, and on these arguments, we affirm without further discussion.

*The Trial Evidence*

The trial evidence revealed the following. The City of Sebastian operates under a charter form of government and its city manager, city attorney, and city clerk are charter officers. The charter requires the city council to meet once a month, but meetings are usually held twice monthly with charter officers being required to attend the meetings. Additionally, the city manager requires the attendance of IT personnel to facilitate the broadcast of meetings to the public. Meetings typically start at 6:00 p.m. and are broadcast live.

Parris, Gilliams, and Charles Mauti were elected to the council in November 2019. According to Mauti, they had a common interest: controlling growth. Councilmembers elected Ed Dodd as mayor. Mauti voted for Dodd, but in the ensuing months he had second thoughts. Gilliams confided in Mauti that he wanted to serve as mayor.

In the wake of the pandemic's arrival in the spring of 2020, changes were made to how meetings were held. Prior to that, the routine was the following. The meeting agenda was typically published to the public no later than the Friday before the meeting. City staff customarily set up 125 chairs in the meeting room, which can accommodate up to 420 people, and the doors to the meeting room were unlocked. When councilmembers were ready to begin the meeting, the mayor would "hit [a] button" and could see that the meeting was being broadcast. Doors to the meeting room were kept locked "all the time except for when we have meetings." When no meeting was being held, city officials with a passkey could enter the locked meeting room doors, but the doors automatically locked thereafter.

Beginning with a meeting held in March 2020, the city utilized the Zoom platform, and it "moved the public outside into the courtyard in order to maintain the social distancing." Speakers were placed outdoors "so that

people could listen" to the meeting being held indoors. Additionally, members of the public who wished to be heard were escorted indoors and then back to the courtyard once they finished speaking. As one city employee explained, "We were trying to get creative, trying to make sure the public had every opportunity to be able to participate in these meetings."

Also in March 2020, Mayor Dodd signed an emergency declaration giving the city manager the authority to cancel meetings. According to another councilmember, Jim Hill, the council "made it very clear to the city manager that if . . . he wasn't able to hold a safe meeting" or if there were no emergency issues to be addressed, he could cancel an upcoming meeting.

The charges which the state brought against Parris were based on the facts surrounding the city council meeting scheduled for April 22, 2020, and the events that followed. As the April 22 meeting approached, the city received "an extraordinary amount of emails" from residents who felt it would be prudent to cancel the meeting for public health reasons even though "hot button" topics were on the meeting agenda that had generated much interest from the public. Two of the five councilmembers, including the mayor, advised the city manager that he should cancel the meeting.

In the days leading up to the scheduled April 22 meeting, councilmembers and charter officers communicated regarding whether the April 22 meeting would go forward. On April 19, Gilliams emailed the city manager, requesting he not cancel the meeting, and he advised he would request an emergency meeting if the meeting was canceled. The next day, Gilliams emailed the IT manager, the city manager, and the city attorney, requesting an emergency/special meeting. Councilmember Mauti also emailed the city manager and councilmembers on April 20, stating that he did not agree to cancel the April 22 meeting and he planned to attend.

Meanwhile, the city's staff continued to prepare for the April 22 meeting. The meeting date and time and the agenda had been publicized to the city's residents. The agenda for the meeting contained the typical items: invocation, recitation of the Pledge of Allegiance, roll call, announcements, proclamations, and other routine matters. The agenda also included a resolution related to pandemic protocol, a quasi-judicial hearing to be conducted by the council in its capacity as the Board of Adjustment, a proclamation related to the retirement of the chief of police, and Mauti's request to replace the mayor.

At 2:36 p.m. on April 22, the city manager notified the councilmembers, city attorney, and city clerk by email that he was postponing the meeting:

> Based on the consensus of the City Council and the authority granted by the Declaration of Local State of Emergency, I am directing that the meeting of April 22, 2020 be postponed and all items carried forward to the next regularly scheduled meeting.

The meeting was canceled because it became apparent that contentious topics on the agenda were going to draw a large crowd, and the city was "expecting more public than we could accommodate and maintain Sunshine." Additionally, the city was still fine-tuning accommodations it would provide to comply with pandemic restrictions and the Sunshine Law.

Upon being told by the city manager of the meeting's cancellation, the city clerk notified city residents who were on her email list, department heads, the police chief, and the IT staff, as the latter were preparing the room and courtyard for the meeting. Staff "started putting equipment away," and a notice of the cancellation was posted on the city's website, its broadcast channel, and on the doors to city hall. The city clerk left city hall at 4:30 p.m.

Gilliams was aware the meeting had been canceled, but a city resident, Russell Herrmann, informed him that Gilliams's "supporters" were gathering at city hall and "they want to have a rally." Gilliams decided to go and went to city hall dressed in casual clothing and carrying his bullhorn. Herrmann called Parris at about 5:10 p.m. to let her know about the rally. She responded that it was "late notice" but she would try to attend. Over at city hall, Gilliams informed residents who had turned out that the meeting had been canceled but they were going to proceed with the meeting once Parris arrived.

Mauti also went to city hall. He was dressed in a suit and ready for a meeting. He was surprised to see a number of people standing outside, as "usually people enter the town hall." He asked Gilliams "what was going on," and Gilliams told him there was a sign posted on the door announcing the meeting was "postponed or canceled." The city hall doors were locked, but Gilliams used a passkey to gain access. None of the charter officers were there, and the meeting room was dark and not set up for a meeting. When Parris showed up, dressed "[i]mpeccably," Gilliams advised them they had a quorum for a meeting and could proceed.

4

At about 6:00 p.m., Mayor Dodd went to city hall to see if any residents had not received word of the canceled meeting. He saw supporters of Gilliams, Parris, and Mauti standing in the courtyard and signs were taped to the city hall doors announcing the cancellation of the meeting. Upon being told councilmembers were in the chambers, Mayor Dodd knocked on the doors, as they were locked. Gilliams let him in, and he saw that Mauti was also present. Mayor Dodd warned Gilliams and Mauti he would call law enforcement, but Gilliams told him to "go ahead." When Mayor Dodd went back into the courtyard, he saw Parris. Mayor Dodd left, as he was concerned he would violate the Sunshine Law if he remained.

Back in the city hall meeting room, Mauti and Gilliams worked on their agenda that was "limited to the reorganization of the city council and the firing of certain members." Some residents entered the meeting room, including supporters of Gilliams, Mauti, and Parris. But other residents were locked out. Mauti, Gilliams, and Parris proceeded to hold a meeting, and they voted on matters that were not on the previously publicized agenda. They voted to do the following: terminate the employment of the city manager, the city attorney, and the city clerk; modify the emergency declaration so that the city manager was not authorized to cancel meetings; "rescind the mayor" and seat Gilliams as mayor; and "retain a[n] outside attorney for the next meeting" and suspend the city attorney. One of the residents watching warned, "Here come the police," and the meeting was hastily adjourned.

An investigator with the State Attorney's Office, Ed Arens, was assigned to investigate written complaints filed by Parris and Gilliams regarding the city manager's cancellation of the meeting. Arens found it suspicious that their complaints matched and, on April 24, Arens met with and interviewed Parris. Arens broached the subject of the April 22 meeting being canceled, and Parris stated she "had mixed messages that entire day" and received "numerous . . . conflicting phone calls and emails from the . . . city manager . . . that day." She also indicated she did not have any communications with Gilliams or Mauti that violated the Sunshine Law. She claimed that on April 22, she was studying the agenda between 4:00 and 5:30 p.m. to prepare for that day's meeting. Arens obtained telephone records and confirmed no calls were made from the city manager to Parris on April 22. Arens also looked at Parris's Facebook page. At 4:24 p.m. on April 22, about two hours after the city manager announced the cancellation of the meeting, Parris posted a photo of herself in a car with the caption, "cancel me." During a subsequent interview, Parris explained that the noticed meeting was canceled "incorrectly," as she did not receive 24 hours' notice. She denied being aware of the city manager's email, as she was preparing for the meeting.

5

City residents testified at trial that they had planned to attend the meeting but did not go upon receiving the cancellation email or seeing the notice on the city's website. Other residents did not learn of the cancellation until they arrived at city hall.

*Analysis*

*Sunshine Law Violation*

Parris was charged with a violation of the Sunshine Law, which provides as follows in pertinent part:

> (1) All meetings of any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation, or political subdivision . . . at which official acts are to be taken are declared to be public meetings open to the public at all times, and no resolution, rule, or formal action shall be considered binding except as taken or made at such meeting. The board or commission must provide reasonable notice of all such meetings.
>
> . . . .
>
> (3)(b) Any person who is a member of a board or commission or of any state agency or authority of any county, municipal corporation, or political subdivision who knowingly violates the provisions of this section by attending a meeting not held in accordance with the provisions hereof is guilty of a misdemeanor of the second degree . . . .

§ 286.011, Fla. Stat. (2019). Specifically, Parris was alleged to have violated the Sunshine Law by holding a meeting that was not open to the public and without reasonable notice. She was also charged with perjury based on statements to Arens in her April 24 interview.

Turning to the issues raised on appeal, we must reject as meritless Parris's first argument that the Sunshine Law is unconstitutionally vague. Parris contends that because the phrases "reasonable notice" and "open to the public at all times" are not defined in section 286.011, Florida

Statutes (2019), she did not know what conduct was prohibited, and, thus, her constitutional right to notice of prohibited conduct was violated.[2]

"[I]n order to withstand a vagueness challenge, a statute must provide persons of common intelligence and understanding adequate notice of the proscribed conduct. Additionally, the statute must define the offense in a manner that does not encourage arbitrary and discriminatory enforcement." *DuFresne v. State*, 826 So. 2d 272, 275 (Fla. 2002) (citations omitted). "However, '[t]he legislature's failure to define a statutory term does not in and of itself render a penal provision unconstitutionally vague. In the absence of a statutory definition, resort may be had to case law or related statutory provisions which define the term . . . .'" *Id.* (alterations in original) (quoting *State v. Hagan*, 387 So. 2d 943, 945 (Fla. 1980)). "[I]n cases where the exact meaning of a term was not defined in a statute itself, we have ascertained its meaning by reference to other statutory provisions, as well as case law or the plain and ordinary meaning of a word of common usage." *Id.*

With respect to "reasonable notice," "reasonable" is defined, in part, as "fair and sensible" and "as much as is appropriate or fair in a particular situation." *Oxford Am. Dictionary & Thesaurus*, 1079 (2d ed. 2009). "Notice" is defined, in part, as "information or warning that something is going to happen," "a sheet or placard put on display to give information," and "a small announcement or advertisement published in a newspaper." *Id.* at 880.

This court's interpretation of the phrase "reasonable notice" is consistent with these definitions. In *Transparency for Florida v. City of Port St. Lucie*, 240 So. 3d 780, 786 (Fla. 4th DCA 2018), we looked to Florida Attorney General opinions interpreting what constitutes sufficient notice under the statute. These opinions have provided that what satisfies "reasonable notice" "is variable and depends on the facts of the situation,"

---

[2] Parris asserts that the rule of lenity requires reversal. "When a court must construe an equivocal criminal statute, or when the statute is open to more than one interpretation and the court is otherwise unable to determine which interpretation was intended by the Legislature," as opposed to "arbitrarily choosing one of the competing interpretations, the rule [of lenity] provides that a court should apply the interpretation that treats the defendant more leniently." *Key v. State*, 296 So. 3d 469, 471 (Fla. 4th DCA 2020). However, application of the rule of lenity to a criminal statute typically involves competing interpretations. *See, e.g.*, *Wooden v. United States*, 142 S. Ct. 1063, 1069 (2022). Parris offers no possible competing interpretations nor any construction analysis, and, thus, her argument is more akin to an argument that a statute is unconstitutionally vague.

7

but "special meetings should have at least 24 hours reasonable notice to the public." *Id.* (quoting Op. Att'y Gen. Fla. 2000-08 (2000)). Further, a Florida Attorney General opinion "finds that the type of notice given depends on the purpose for the notice, the character of the event about which the notice is given, and the nature of the rights to be affected." *Id.* at 787 (citing Op. Att'y Gen. Fla. 73-170 (1973)). We also noted that the Attorney General addressed the term "reasonable notice" in its Government-In-The-Sunshine Manual, which provides as follows:

> 3. Except in the case of emergency or special meetings, notice should be provided at least 7 days prior to the meeting. Emergency sessions should be afforded the most appropriate and effective notice under the circumstances.
>
> 4. Special meetings should have no less than 24 and preferably at least 72 hours reasonable notice to the public.

*Id.* (quoting 39 Government-in-the-Sunshine Manual, § (D)(4)(a)3., 4. (2017)). This court concluded that "[w]here there is no specific legislative directive as to what constitutes reasonable notice as a matter of law, we agree with the Attorney General that it is a fact specific inquiry." *Id.* (reversing and holding summary judgment was improper where there was a disputed issue of fact as to whether 21.5 hours' notice was reasonable under the circumstances).

Few appellate cases have addressed the issue of what constitutes reasonable notice, but the First District Court of Appeal has held that notice of a special meeting was reasonable where the special meeting was announced at the previous meeting and on a local radio station three days prior, the city posted the meeting agenda outside of city hall and delivered copies to the local media two days prior, and the media published an article regarding the meeting the day before. *Yarbrough v. Young*, 462 So. 2d 515, 516-17 (Fla. 1st DCA 1985). The First District has also held that a complaint made a prima facie showing of violation of the Sunshine Law by alleging that a public meeting regarding the appointment of a committee to study the operation of a regional utility authority was held without reasonable notice to the public where the meeting was held after approximately 1.5 hours' notice to the media. *Rhea v. City of Gainesville*, 574 So. 2d 221, 222 (Fla. 1st DCA 1991); *see also Fla. Citizens All., Inc. v. Sch. Bd. of Collier Cnty.*, 328 So. 3d 22, 28 (Fla. 2d DCA 2021) (applying the analysis of *Transparency for Fla.* and holding that "burying a notice inside a committee application and calendar on the instructional materials page of the District's website is an unreasonable way to give public notice of a meeting").

Next, with respect to the phrase "open to the public," the word "open" is defined, in part, as "exposed to view or attack; not covered or protected," "admitting customers or visitors; available for business," "accessible or available," "frank and communicative," and "not disguised or hidden." *Oxford Am. Dictionary & Thesaurus* at 901. "Public" is defined, in part, as "relating to or available to the people as a whole." *Id.* at 1043.

Case law also provides guidance as to the meaning of "open to the public." In *Rhea v. School Board of Alachua County*, 636 So. 2d 1383 (Fla. 1st DCA 1994), the court entertained whether a workshop held in Orlando by the Alachua County School Board while attending a convention violated the Sunshine Law's requirement that official action occur in a meeting open to the public. *Id.* at 1384. Although the board advertised the meeting in a Gainesville newspaper and stated that all persons were invited, it was more than 100 miles away from the board's headquarters. *Id.*

The First District recognized that the statute does not define "public," but that "[i]n construing a statute, words that are undefined by the statute should be given their plain and ordinary meaning." *Id.* at 1385. The court looked to the dictionary definition of "public" as "of, relating to, or affecting the people as an organized community; a place accessible or visible to all members of the community; an organized body of people: community, nation; a group of people distinguished by common interests or characteristics." *Id.* (citing *Webster's 3d New Int'l Dictionary* 1836 (1981)). Applying the plain and ordinary meaning of the word to the case before it, the court held that "the relevant 'public,' the community that would be affected by the Board's official actions, is Alachua County." *Id.* The court recited factors to be considered in determining whether the public was provided a reasonable opportunity to attend a meeting that is subject to the Sunshine Law: the interests of the public in having a reasonable opportunity to attend the meeting, the board's need to conduct a meeting at a site beyond the county boundaries, the extent of the distance from the usual meeting place, and any good faith action by the board to minimize the expense and inconvenience of the public in attending the out-of-county meeting. *Id.* Applying the test to the case before it, the court held the meeting held in an Orlando hotel room violated the Sunshine Law, as it did not afford the citizens of Alachua County a reasonable opportunity to attend. *Id.* at 1386; *see also Bigelow v. Howze*, 291 So. 2d 645, 646-48 (Fla. 2d DCA 1974) (holding that trial court properly declared public contract void where committee members who were members of the public body violated Sunshine Law by deliberating on a committee's recommendations while in Tennessee and then conducting a related meeting in a public room at a Florida hotel, since the "requisite advance

notice and the reasonable opportunity [for the public] to attend did not exist").

More recently, in *Herrin v. City of Deltona*, 121 So. 3d 1094 (Fla. 5th DCA 2013), the court wrote that "[t]he phrase 'open to the public' most reasonably means that meetings must be properly noticed and reasonably accessible to the public, not that the public has the right to be heard at such meetings." *Id.* at 1097.[3]

Here, the lack of definitions for "reasonable notice" and "open to the public" in the statute do not render it unconstitutionally vague. To the extent the language requires any interpretation, the well-established case law and the plain and ordinary meaning of the terms provide ample guidance. Applying these definitions to the evidence here, sufficient evidence showed that Parris knowingly participated in a meeting that was not "open to the public" and for which "reasonable notice" was not given.

*Perjury Charge*

We also reject Parris's second argument that the state did not prove the perjury charge against her in count VI where the investigator's questioning was imprecise.

The crime of perjury is codified in section 837.012, Florida Statutes (2019), which provides that "[w]hoever makes a false statement, which he or she does not believe to be true, under oath, not in an official proceeding, in regard to any material matter shall be guilty of a misdemeanor of the first degree." "The statement alleged to be perjury must be one of fact, and not of opinion or belief." *Vargas v. State*, 795 So. 2d 270, 272 (Fla. 3d DCA 2001). "The questions posed to elicit perjured testimony must be asked with the appropriate specificity necessary to result in an equally specific statement of fact." *Cohen v. State*, 985 So. 2d 1207, 1209 (Fla. 3d DCA 2008). "Precise questioning is imperative as a predicate for the offense of

---

[3] Parris argues these cases are inapplicable as they do not involve a criminal violation of the Sunshine Law. Although our courts' discussion of the meaning of "reasonable notice" and "open to the public" is contained in civil cases, the discussion extends to the meaning of the phrase in the criminal law context. *See Wolfson v. State*, 344 So. 2d 611, 614 (Fla. 2d DCA 1977) (acknowledging that the definition of "official act" it relied on was "employed in a civil context," but observing that "we can think of no reasoning process which would compel the conclusion that it necessarily assumes a fatal vagueness when considered in a criminal context").

perjury." *Id.* (quoting *Bronston v. United States*, 409 U.S. 352, 362 (1973)). A statement regarding a person's recollection is not an assertion of empirical fact that can support a perjury conviction. *McAlpin v. Crim. Just. Stds. & Training Comm'n*, 155 So. 3d 416, 421 (Fla. 1st DCA 2014). "[A]n initially false statement . . . can be further explained so that the statement taken as a whole is not perjury." *Id.* "The typical manner of proving perjury is to have two conflicting sworn statements by the same person." *Id.*

Here, the perjury charge against Parris alleged in count VI of the information was based on her statements in the first half of the April 24 interview by Arens, and it alleged that Parris "falsely told a law enforcement officer that on April 22, 2020, she had several telephone conversations with City Manager Paul Carlisle concerning whether the April 22, 2020 Sebastian Council meeting was postponed or canceled." During this interview, Arens communicated his understanding that the April 22 meeting had been canceled, and Parris volunteered that she had "mixed messages that entire day" and "received numerous phone calls, conflicting phone calls and emails from the . . . city manager . . . that day." She "wish[ed]" he had sent her "all email," but "[h]e chose to call me on my phone a few times." She was "under the impression that there were two meetings scheduled by 5:00," so she "got dressed and went to city hall . . . and I went into my meeting." Arens stated that he thought the city manager sent an email "to all of you" at 2:30 p.m. canceling the meeting, and Parris responded, "There were several phone calls after that."

We hold sufficient evidence showed that Parris made a false statement when she asserted that she had received numerous phone calls and emails from the city manager on April 22. At trial, the state's evidence included phone records showing that the city manager never called Parris on April 22. Arens's statements and questions, and Parris's responses, read in context, indicate Parris was asserting that the city manager called her several times on April 22 and gave her conflicting information as to whether the meeting was canceled. Based on these "mixed messages," she thought the April 22 meeting was still on, and she went to city hall. As the prosecutor showed the jury, Parris's statements conflicted with what the phone records actually showed.

Third, Parris argues that the state did not prove the perjury charge alleged against her in count V of the information. There, the state alleged that Parris "falsely told a law enforcement officer that she had no phone conversations with any other council members on April 22, 2020." We agree with Parris that the state's evidence fell short.

As evidenced at trial, during the interview, Arens and Parris took a break due to Arens's recorder's batteries running out of power. During the second half of the interview, the parties began discussing Arens's role at the State Attorney's Office. Parris then reminded Arens that he had been asking about the April 22 meeting being videotaped or held on the Zoom platform, and she volunteered that she had consulted with her doctor about whether she should attend public meetings, and she felt it was important to attend meetings in person. She also spoke about her conversations with the city manager and the city clerk regarding how to allow for public input during the pandemic.

After briefly changing topics, Arens asked the question that led to the statements related to count V: "[Y]ou've had a lot of phone calls you said from people that were trying to, or from people about the meeting happening. You said you received phone calls or texts or messages?" Parris responded, "No, it was the city manager." Arens sought to clarify: "Did you receive any phone calls or texts from Mr. Gilliam[s] or Mr. Mauti or anybody –". Parris interjected:

> I'm not . . . going to do that, no. That's the Sunshine Law.
> . . . That was pounded into my head from day one. . . . Not
> to talk to them. And I think it's odd because it makes it really
> hard to come to good solutions when you can't communicate.
> But I've asked even a gentleman from Rick Scott's office. He
> sat down and he was kind enough, when I came to office to
> greet me and . . . explain everything and it is what it is because
> (indiscernible) I go out of my way to make sure I don't violate
> that.

This evidence does not reflect that Parris clearly indicated she "had no phone conversations with any other council members on April 22, 2020." The statements forming the basis of count V were made during the second half of the interview, a significant amount of time after the April 22 meeting was referenced. Additionally, Arens asked Parris a broad question regarding whether she had conversations with members of the public pertaining to the April 22 meeting. Nothing in this broad question indicated that Arens was limiting Parris to phone calls and communications received on April 22 by other councilmembers. Parris's response to the unclear question was to state that she was referencing the city manager. Arens attempted to clarify that he was talking about the other councilpersons, but again, he failed to make it clear he was referencing April 22. Further, even if it could be said that Parris's response related to April 22, she did not make it clear that she had not spoken to the other councilmembers at all. Read in context, Parris seemed to be

12

denying that she had any communications with them that violated the Sunshine Law.

Finally, we reject Parris's contention that her statements were not material. "'[M]ateriality' is not an element of the crime of perjury in Florida but is a threshold issue that a court must determine as a matter of law prior to trial." *Vargas*, 795 So. 2d at 272. "'Material matter' means any subject, regardless of its admissibility under the rules of evidence, which could affect the course or outcome of the proceeding. Whether a matter is material in a given factual situation is a question of law." § 837.011(3), Fla. Stat. (2019). "To be material, statements must be germane to the inquiry, and have a bearing on a determination in the underlying case." *Vargas*, 795 So. 2d at 272. However, "[i]t is not essential that the false testimony bear directly on the main issue. It is sufficient if the false testimony is collaterally or corroboratively material to the ultimate material fact to be established." *Gordon v. State*, 104 So. 2d 524, 531 (Fla. 1958). Here, Parris's statements are material because the statements showed her intent to participate in a meeting that was not reasonably noticed and not open to the public at all times.

## *Conclusion*

Based on the foregoing, we reverse Parris's perjury conviction on count V and we remand for the county court to vacate the count V conviction and sentence. We affirm with respect to all other issues.

*Affirmed in part, reversed in part, and remanded with directions.*

KLINGENSMITH, C.J., and WARNER, J., concur.
CIKLIN, J., concurs specially with opinion.

CIKLIN, J., concurring specially.

The majority opinion solidly stands for the "clinical" legal reasoning and academic analysis behind our decision to both affirm and reverse certain of the convictions that occurred before a jury below.

I think it is important, however, to issue a clarion call to the hundreds of Florida public officials who are subject to the Florida Sunshine Law. Indeed, as more and more individuals become Floridians and engage in civic involvement, our new citizens need to be fully aware of Florida's

Sunshine Law.[4]  The appellate briefs filed in this case suggesting that the Sunshine Law is vague and unclear or that the law is weak and unprovable have given me pause and a commensurate urge to raise a warning flag.  It has been many years since a comprehensive opinion has been issued by a Florida intermediate appellate court on the subject and, thus, perhaps this admonition is particularly timely.

It seems unlikely, in this unfortunate series of events, that former Sebastian City Councilmembers Pamela Parris and Damien Gilliams would have ever thought it imaginable that they would now be appealing criminal convictions for which they have been sentenced to serve jail time of two months and six months, respectively.  My guess is, that in retrospect, they would have run away and resisted any temptation to get caught up in the excitement of the moment . . . as, unfortunately, they ultimately did.  These recent Indian River County Sunshine Law prosecutions and convictions illustrate actual examples of popularly elected local governing body officials being ordered to do real jail time in a real Florida county jail for the commission of a real Florida crime.  Of course, whether elected or appointed is of no consequence.  The Florida Sunshine Law applies equally to all.

After now engaging in significant research on the law itself, plus sitting for oral argument on the topic in January, I have developed a concern that some government officials subject to the Sunshine Law may not fully appreciate the Law's meaning and/or the possible criminal penalties that lie in wait for those who carelessly fail to fully comprehend the Sunshine Law and abide by it.  And this baffling complacency is not for want of official publications—including the current 360-page Government-In-The-Sunshine manual prepared by the Florida Attorney General.  44 Government-in-the-Sunshine Manual (2022 ed.).  To be sure, the briefings in these consolidated cases, and our majority opinion are considerably lengthy because the issues are complex and yet, paradoxically, not all that difficult to understand.

The scenario in this case is alarming.  Three duly elected members of the Sebastian City Council who were not allowed to privately discuss foreseeable government issues did so anyway.  They decided amongst themselves—as their personal protest to the mayor and city manager's decision to cancel a regularly scheduled city council meeting because of

---

[4] The Sunshine Law applies to "any board or commission of any state agency or authority or of any agency or authority of any county, municipal corporation or political subdivision." § 286.011(1), Fla. Stat. (2019).

14

Covid—to enter the city council chambers and conduct the cancelled meeting anyway. Armed with a government-issued pass key, and in unlit city council chambers, these three city councilmembers took to the dais and purported to take official action at what in essence became a spontaneous, non-announced meeting of the three of them that lasted until the police showed up. That imprudent action was itself a flagrant violation of the Sunshine Law and a reading of the statute makes this conclusion abundantly clear.

Whether two or more officials privately discuss, in any manner whatsoever, a foreseeable issue of any magnitude, inside the other's office or at a coffee shop or in the spectator audience of a child's soccer match or at a statewide education conference or by quick text or whether they do so through surrogates (such as aides, friends, relatives, other government officials) or whether, as in this case, they decide to spontaneously convene an unannounced rally or meeting, so long as two or more are involved, these are all distinctions without a difference. And every individual unauthorized private discussion between two or more officials along the way constitutes an individual statutory crime against each person with each separate charge carrying a possible penalty of 60 days in the county jail. Plus a $500 fine. Plus substantial court costs. Plus six months of probation. Per act. And notably, in the State of Florida, no statutory sentencing guidelines exist for these types of crimes and consecutive jail sentences and consecutive probationary periods are permitted and within the unfettered discretion of the trial judge.

Even though ample publications, and just as many available seminars, meetings, discussions, and groups, are specifically charged with fully educating officials subject to the Sunshine Law (which, ironically all three charged city councilmembers attended), here are my very easy takeaways from the current state of the Florida Sunshine Law.

1. Meetings of two or more fellow government officials who are subject to the Sunshine Law are not allowed if any words of any type pertaining to any possible foreseeable issue will be communicated in any way unless they are open to the public to whom reasonable notice has been provided.

2. There is rarely any purpose for a private meeting or communication between two or more government officials who are both are subject to the Sunshine Law. Those who engage in such activity widely open themselves to allegations that some aspect of the governmental decisional process has unlawfully occurred behind closed doors. Any aspect of the

15

decisional process—ranging from whether to conduct a meeting in the first instance to the concept of terminating administrative staff to the seemingly inane decision as to which government officials will even make a motion to begin open public discussion—is part of the official decisional process and must be wide-open and advertised in advance to the public.

3.    Under Florida law, there is no such thing as an "informal" conference or "unofficial" caucus or pass-you-in-the-hallway information gathering (or sharing) by two or more government officials subject to the Sunshine Law which would thereby remove such communication from the Sunshine Law's ambit. Indeed, such "innocuous" meetings have been held to be illegal and nothing short of the unlawful crystallization of secret decisions to a point just short of public discussion and ceremonial acceptance.   And whether done personally or through surrogates (such as aide-to-aide), such meetings are illegal under Florida's Sunshine Law.

4.    Any attempt to distinguish between a "formal," "informal," "ministerial," "informational gathering-only," or "just a listening" meeting between two or more government officials— for purposes of determining whether the Sunshine Law applies—is by itself alien to the law's design, exposing it to the very evasions which it was designed to prevent.

5.    Because a violation of Florida's Sunshine Law can be investigated and charged as a crime, all of those law enforcement and prosecutorial techniques, such as the issuance of subpoenas for cell phone records is but a signature away.  In these cases, prosecutors easily gathered data and produced it for the jury showing numerous texts, emails, telephone conversations and voicemails over a wide-ranging period between all three city councilmembers.  The flow chart prepared by the prosecution and shown to the jury highlighted the dates of the calls, to whom they were made, the duration of the calls and the overall sequence of communications.

6. When in <u>any</u> doubt, as to whether a meeting or communication, either directly or indirectly between two or more government officials may be illegal under the Sunshine Law, the easy answer is: "LEAVE." *See City of Miami v. Berns,*

245 So. 2d 38, 41 (Fla. 1971) ("The evil of closed door operation of government without permitting public scrutiny and participation is what the law seeks to prohibit. If a public official is unable to know whether by any convening of two or more officials he is violating the law, he should leave the meeting forthwith.").

7. Lying, under oath, about any matter that is material to an alleged Sunshine Law violation is considered as an additional crime of perjury and every individual lie constitutes an individual statutory crime against each person with each separate charge carrying a possible penalty of 1 year in the county jail. Plus a $1000 fine. Plus substantial court costs. Plus 12 months of probation. Per lie. And just as is the case with the underlying Sunshine Law crime, no statutory sentencing guidelines exist for this type of crime in Florida and thus consecutive jail sentences and consecutive probationary periods are permitted and within the trial judge's unfettered discretion.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***